**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Spencer HOGUE, Jr., Defendant-Appellant.**

No. 85–7518.

United States Court of Appeals, Eleventh Circuit.

March 30, 1987.

Richard D. Horne, Hess, Atchison & Horne, Mobile, Ala., C. Lani Guinier, New York City, Deval L. Patrick, Hill & Barlow, Boston, Mass., for defendant-appellant.

J.B. Sessions, III, U.S. Atty., E.T. Rolison, Jr., Asst. U.S. Atty., Mobile, Ala., for plaintiff-appellee.

Before RONEY, Chief Judge, CLARK, Circuit Judge, and DOYLE *, Senior District Judge.

---

* Honorable James E. Doyle, Senior U.S. District Judge for the Western District of Wisconsin, sitting by designation.

1. Jurisdiction for this appeal is present under 28 U.S.C. § 1291. *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977).

2. The matters set forth in this section consist entirely of summaries of the record of the proceedings in the earlier case, *United States v. Albert Turner, Spencer Hogue, Jr., and Evelyn Turner,* United States District Court of the Southern District of Alabama, Criminal No. 85–00014, and summaries of the record of the proceedings in the same district court in the present case, Criminal No. 85–00025, as those district court records appear in the record on the present appeal from the district court order in 85–00025. The record on the present appeal from the district court order in 85–00025 includes little of the district court record in 85–00014. In oral argument on this appeal, counsel represented that little of the trial proceedings in 85–00014 has been transcribed. How-

DOYLE, Senior District Judge:

This is an appeal from a district court order denying a motion to dismiss, on grounds of collateral estoppel, an indictment charging appellant Hogue with endeavoring to obstruct justice, in violation of 18 U.S.C. § 1503.[1] Hogue contends a factual issue predicate to a conviction of the crime charged in the present indictment was decided in his favor in an earlier criminal prosecution in which he was acquitted. We conclude appellant has failed to meet his burden of persuasion, by convincing and competent evidence, that the issue he seeks to foreclose in the present case must necessarily have been decided in his favor in the earlier case.

## FACTS [2]

### I. *The earlier case (no. 85–00014)*

#### A. *The indictment*

On January 25, 1985, in the United States District Court for the Southern District of Alabama (case number 85–CR–00014), a grand jury returned a twenty-nine count indictment. Hogue, Albert Turner and Evelyn Turner are named as defendants in counts 1 through 27, only Albert Turner in count 28, and only Hogue in count 29.

#### 1. *Count 1*

Count 1 alleges that in violation of 18 U.S.C. § 371, beginning on or about Au-

ever, the record on the present appeal does include the following items from the district court record in 85–00014 which were not presented by Hogue to the district court in support of his motion to dismiss the present case (85–00025): opening statement by the prosecutor; redacted testimony of Hogue before the grand jury; closing argument by Ms. Guinier, one of Hogue's attorneys; and the indictment. It appears that this court has not acted earlier on Hogue's motion dated March 7, 1986 and filed March 11, 1986, to supplement the record on this appeal by including the indictment in 85–00014. Although it is generally disruptive of the appellate process to receive on appeal items of evidence not presented to the district court, we grant the motion, in the interest of judicial economy. We note that the district judge who entered the order in 85–00025 now appealed from is the district judge who presided at the trial in 85–00014 and was familiar with the record in 85–00014.

gust 1, 1984 and continuing through on or about September 5, 1984, Hogue and the Turners and others conspired: (1) to use the mails, in violation of 18 U.S.C. § 1341, in furtherance of a scheme to defraud the citizens of Perry County, Alabama, and of the state of Alabama of a fair and impartial Democratic primary election on September 4, 1984; and (2) to vote more than once, in violation of 42 U.S.C. § 1973i(e), in that primary held in part for the purpose of selecting candidates for the United States Senate. The object of the conspiracy was to secure the nomination of candidates endorsed by an organization to which Hogue and the Turners belonged.

The conspiracy was to be executed by: approaching and urging citizens to cast absentee ballots; assisting in executing and submitting applications for absentee ballots; ascertaining when the blank absentee ballots were sent to the applicants and then visiting the applicants; attempting to persuade the absentee voters to vote for defendants' slate and observing the marking of the ballots; encouraging the absentee voters to execute false oaths on the absentee ballots that the voters were entitled to vote absentee because of travel or physical incapacity; taking physical custody of the absentee ballots once they had been marked; opening and fraudulently changing those ballots that had not been marked for defendants' slate; notarization of oaths by absentee voters who were unknown to the notary and who had signed the oaths outside her presence; and affixing stamps to the absentee ballots which had been obtained and altered in the manner described and placing them in the mail for transmission to the Perry County circuit clerk for tabulation.

Overt acts were performed by the defendants in furtherance of this conspiracy and to accomplish its purposes. These overt acts include 24 specifically described in the indictment. Eleven of the 24 overt acts were performed only by Albert Turner; each occurred on or about September 1, 1984; each involved a meeting by Turner with 1 of 11 named voters for the purpose of procuring her or his absentee ballot.[3] Four of the 24 overt acts were performed only by Hogue; each occurred on or about September 1, 1984; each involved a meeting by Hogue with 1 of 4 named voters for the purpose of procuring her or his absentee ballot; one of the 4 said voters was a Will Fuller.[4] Seven of the 24 overt acts were performed only by Evelyn Turner; each occurred on or about September 2, 1984; each involved notarizing or signing as a witness an absentee ballot of 1 of 7 named voters.[5] Two of the 24 overt acts were performed by Hogue and the Turners; they occurred on or about September 3, 1984. One involved a meeting for the purpose of discussing the subject of absentee ballots; the other, entering a post office for the purpose of placing in the mail the absentee ballots referred to in the first 22 overt acts. An aggregate of 18 different voters are named in one or more of the 24 alleged overt acts.

### 2. Counts 2 through 27

Each of counts 2 through 27 alleges that in violation of 18 U.S.C. § 1341, beginning on or about August 1, 1984 and continuing through on or about September 1, 1984, Hogue and the Turners and others devised a scheme to defraud the citizens of a fair and impartial Democratic primary election on September 4, 1984. The object of the scheme was to secure the nomination of defendants' slate. The scheme was to be executed by the same behavior on the part of the defendants as that described in count 1: approaching voters to persuade them to apply for absentee ballots; assisting them with the applications; approaching the voters again when the absentee ballots reached them, to persuade them to

---

3. Fannie M. Shelton (count 1, paragraph 5(a)), Mims Shelton (5(b)), Cleophus Shelton (5(c)), Loretta Shelton (5(d)), Alma Price (5(e)), Mary D. Shelton (5(f)), Edward Shelton (5(g)), Pearl Brown (5(h)), Ezell Stephens (5(i)), William Earl Wimes (5(j)), and Maggie Fuller (5(k)).

4. Mattie Perry (5(l)), Will Fuller (5(m)), Henry Jackson (5(n)), and Reaner Green (5(o)).

5. Morgan Harris (5(p)), Fannie M. Williams (5(q)), Willie Lee (5(r)), William Earl Wimes (5(s)), Edward Shelton (5(t)), Alma Price (5(u)), and Loretta Shelton (5(v)).

mark the ballots for defendants' slate and to encourage the voters to execute false oaths explaining why it was necessary for them to use absentee ballots; taking custody of the executed absentee ballots and changing the markings as necessary so that they designated defendants' slate; notarizing them despite the absence of the notary at the time the oaths were signed by the voters; and mailing the ballots to the Perry County Circuit Clerk for tabulation.

Each of counts 2 through 27 then proceeds to allege that on or about September 3, 1984, Hogue and the Turners, for the purpose of executing the scheme and attempting to do so, placed in the mail to the election official an envelope containing the altered absentee ballot of a specifically named voter.[6] The 26 voters specified in counts 2 through 27 include all of the 18 persons who are also named as absentee voters in count 1; Will Fuller is among the 18. The list of 26 includes 8 persons who are not named as absentee voters in count 1. Thus, a total of 26 absentee voters are named in the indictment.

### 3. Counts 28 and 29

Counts 28 and 29 allege that in violation of 42 U.S.C. § 1973i(e), Albert Turner and Hogue, respectively, voted more than once in the September 4, 1984 primary election.

### 4. Modification of indictment

As submitted to the jury, the indictment no longer included 7 of the 22 overt acts originally alleged in count 1, and it no longer included 8 of the 29 counts that originally appeared in the indictment.[7] The effect of these modifications was that the jury was called upon to consider the events involving a total of 18 absentee voters, of whom one was Will Fuller.[8]

### B. Opening statement by prosecution at trial[9]

In his opening statement at trial, the prosecutor emphasized the conspiracy charge, count 1. His statement of what he expected the evidence to show is summarized in the following portion of this section B of this opinion.

Defendants had been active in the Perry County Civic League. In the September 4, 1984 primary, the League's principal interest was the defeat of Reese Billingslea and Warren Kynard, both candidates for reelection as officials of Perry County. When Billingslea had been elected for the first time, Albert Turner told him to appoint Hogue as supervisor of the road gang. Billingslea responded that he would hire Hogue, but not as supervisor. When Kynard had been elected for the first time, Albert Turner and his family had demanded jobs with the county, and Kynard responded that they should submit applications and that Kynard intended to appoint the most qualified applicants. These incidents gave rise to a vendetta on the part of Albert Turner against Billingslea and Ky-

---

**6.** Morgan Harris (count 2), Fannie M. Williams (3), Willie Lee (4), William Earl Wimes (5), Edward Shelton (6), Alma Price (7), Mary D. Shelton (8), Loretta Shelton (9), Fannie Shelton (10), Pearl Brown (11), Mary Louise Pryor (12), Mims Shelton (13), Cleophus Shelton (14), Mattie M. Shelton (15), Ethel G. Ford (16), Joe Tanner (17), Ezell Stephens (18), Maggie Fuller (19), Mattie Perry (20), Archie Ward (21), Murphy Reed (22), Angela R. Miree (23), Will Fuller (24), Henry Jackson (25), Zayda E. Gibbs (26), and Reaner M. Green (27).

**7.** From count 1 there were eliminated the overt acts relating to absentee voters Alma Price, Ezell Stephens, William Earl Wimes, Henry Jackson, and Reamer M. Green. The eliminated count 5 alleged a mailing of the absentee ballot of William Earl Wimes; count 7, Alma Price; count 17, Joe Tanner; count 18, Ezell Stephens; count

21, Archie Ward; count 22, Murphy Reed; count 25, Henry Jackson; and count 27, Reaner M. Green.

**8.** The 18 are: Morgan Harris, count 2 and paragraph 5(p) of count 1; Fannie M. Williams, 3, and 5(q); Willie Lee, 4, and 5(r); Edward Shelton, 6, and 5(g and t); Mary D. Shelton, 8, and 5(f); Loretta Shelton, 9, and 5(d and v); Fannie M. Shelton, 10, and 5(a); Pearl Brown, 11, and 5(h); Mary Louise Pryor, 12; Mims Shelton, 13, and 5(b); Cleophus Shelton, 14, and 5(c); Mattie M. Shelton, 15; Ethel G. Ford, 16; Maggie Fuller, 19, and 5(k); Mattie Perry, 20, and 5(l); Angela R. Miree, 23; Will Fuller, 24, 5(m); and Zayda E. Gibbs, 26.

**9.** No other opening statement in case number 85–00014 is included in the record of this appeal.

nard, and the League's 1984 opposition to their nomination and its efforts to deprive them of votes were in implementation of this vendetta.

Law enforcement and election officials had been alerted to an attempt by the League to steal the election from Billingslea and Kynard by the use of absentee ballots. The post office was monitored on the eve of the primary and the absentee ballots were handled by election officials in such a manner that it was possible to identify the absentee ballots placed in the mail by the Turners and those placed in the mail by Hogue. Those ballots were scrutinized and various alterations of ballots were noted. The ballots were later turned over to the FBI, which interrogated various persons whose ballots appeared to have been altered.

The conspiracy included a plan that Albert Turner or Evelyn Turner or Hogue would vote more than once in the sense that they would alter more than one ballot, without the voters' consent.

The prosecutor stated that "the issue in this case is whether or not these voters gave permission to the Perry County Civic League to change their ballots."

### C. *Evidence at Trial*

The only testimony, presented at the trial in case number 85–00014, which is included in the record on this present appeal, is the testimony of Lillian Fuller, the testimony of Will Fuller, and the transcribed testimony of Hogue in the course of his appearance before a grand jury prior to the return of the indictment in case number 85–00014. Hogue's grand jury testimony was offered by the government at trial as a part of its case. However, the record on the present appeal does contain a transcript of the closing arguments of the prosecutors in case number 85–00014, as well as a portion of the closing argument by one of Hogue's counsel. From those arguments, it can be discerned that there was testimony concerning 11 separate episodes involving absentee voters: one episode involved the 7 Sheltons; another, Morgan Harris and Fannie M. Williams; and other, distinct

episodes each involved one of the following voters: Willie Lee, Pearl Brown, Mary Louise Pryor, Ethel G. Ford, Maggie Fuller, Mattie Perry, Angela Miree, Zayda Gibbs, and Will Fuller. The 11 episodes occurred at separate places and times. As to each episode, there was a separate witness or combination of witnesses for the prosecution. In the case of Willie Lee, his testimony was that he had never executed an absentee ballot, although a ballot purporting to be his had been mailed to the election officials. In the case of each of the other 17, the prosecution testimony was directed to whether the voter had executed a ballot showing the voter's choices among the candidates, whether the ballot had been changed later but before it was received in the mail by the election officials, and whether the voter had or had not authorized the changes to be made.

Specifically, as to count 24, and paragraph 5(m) of count 1, the government presented the testimony of Will Fuller and his wife, Lillian Fuller, and testimony given earlier to a grand jury by Hogue.

Lillian Fuller testified that she was 73 years of age as of July 1985, and that Will Fuller was 91 years of age as of September 1, 1984, was blind and ill, and had been voting for some time by absentee ballot. Concerning the September 4, 1984 Democratic primary, she testified that: Hogue came to the Fullers' house in connection with the absentee voting; Lillian prepared the absentee ballot for Will Fuller, marked a vote for Reese Billingslea, made no erasures on the ballot, and handed the marked ballot to Hogue, unsealed, to be notarized and mailed. Shown the ballot at trial in the form it had been received by election officials, Lillian Fuller testified that on it the vote for Billingslea had been marked out. She testified that at some time more than a week later and after September 4, 1984, Hogue had come again to the Fullers' house; Lillian Fuller, Will Fuller, and Hogue were those present at the time. She testified that Hogue said: he had rubbed the name off through a mistake; "they" were after Lillian Fuller, Will Fuller and Hogue; and if Lillian Fuller "would get

with Hogue" and say she helped rub it off, "it will be all over with." Lillian Fuller testified that she had not given Hogue permission to rub it off and she had not rubbed it off, and that she told Hogue she would not say she had helped him rub it off.

Will Fuller testified that he intended to vote for Billingslea. He testified that: some time after the first of the year 1985, Hogue brought a calendar to the Fullers' house; Will Fuller had no conversation with Hogue at that time; and Will Fuller heard Hogue and Lillian Fuller talking at that time, but Will Fuller could not understand what Hogue was saying to her.

In his testimony before the grand jury, Hogue stated that: The League was formed in 1962. Prior to the September 4, 1984, Democratic primary, the League activists had frequently arranged for voters to obtain absentee ballots, had tried to persuade the absentee voters to vote for the League's slate, had assisted absentee voters in marking their ballots, and had arranged for the ballots to be mailed to the elections officials. Hogue was one of several League community leaders, each of whom assisted a certain group of people in this way. Many of these people were elderly. The League helped these people in other ways, unrelated to absentee voting, such as transporting them for medical care and assisting them to use the food stamp program. The League endorsed a slate of candidates in the September 4, 1984, Democratic primary. Hogue would go to the homes of the persons to whom the blank absentee ballots had been mailed by the elections officials. He would try to persuade them to vote for the League slate. He would help them to mark their ballots themselves or he would do the marking. In either case, the choices were made by the voters, not by Hogue. When marks were erased or scratched out and new marks made, this was done by the voters or, if the voter consented, by Hogue. Ho-

gue would then take the executed ballots, whether or not the voters had voted for the League's slate, and mail the ballots to the elections officials. Hogue, Will Fuller, and Lillian Fuller were present at the Fullers' house one day prior to the September 4, 1984, primary; Hogue was calling out the names of the candidates the League had endorsed and Lillian Fuller was marking the ballot; when she gave Hogue the marked ballot, he looked at it and told her she had got the wrong name, referring to Billingslea; Hogue talked to her about that and convinced her; she said to Hogue that she had marked the ballot for Billingslea in ink; Hogue told her he could get the ink off, and Hogue made the change.[10]

## D. *Closing arguments*

(1) In the initial closing argument, the prosecution contended:

### (a) *Counts 2–4, 6, 8–16, 19, 20, 23, 24, 26.*

As to counts 2–4, 6, 8–16, and 19, there was sufficient evidence, which was described, that one or both of the Turners had made alterations in the ballots, without the consent of the voters; and as to counts 20, 23, 24 and 26, there was sufficient evidence that Hogue had made alterations in the ballots, without the consent of the voters. As to count 24, specifically, Lillian Fuller had testified that on her husband's ballot she intended to vote for Billingslea, as her husband intended. She did not erase that. Hogue picked up the ballot and that was the last she saw of it until the court proceedings began. Shortly thereafter, Hogue came to her and said, through a mistake, they were after him. Hogue said if she would get with him and say she rubbed it out or rubbed it off, it would be all over. She told Hogue she could not do that. She knows she didn't change anything. Her hands have not rubbed out anything. Hogue confessed to Lillian Fuller. Lillian Fuller came to court and told

---

10. Although the record on this appeal does not reveal it, defendants state in their brief, and it is not disputed, that the defense offered no evidence at trial. Transcripts of the earlier grand jury testimony of Albert Turner and Evelyn Turner, as well as that of Hogue, were placed in evidence at the trial by the prosecution. The transcripts of the grand jury testimony of the Turners are not included in the record on this appeal in 85–00025.

the truth. She didn't change the ballot. She didn't authorize Hogue to change it.

### (b) *Counts 28 and 29.*

As to Count 28, it was enough that Albert Turner had made changes on the ballots of any two or more of the absentee ballots, without the voters' consent. Legally, it means he had himself cast two or more votes. The same is true as to count 29 and Hogue.

### (c) *Count 1*

There was sufficient evidence that the Turners and Hogue had conspired to deprive the public of a fair election.

After spending 28 years in the military, Kynard returned to Perry County. After discussing the possibility with the Turners and Hogue, Kynard ran in 1978 for a county office having to do with tax collection. He was endorsed by the League and he won election. He then spurned the Turners' demand for county jobs.

During his campaign for re-election, Kynard heard Albert Turner on the radio discussing the League's slate of candidates, saying the League had finally got some one to run against the over-educated tyrant and tax collector Kynard. Shortly after hearing that radio broadcast, Kynard was approached by a county employee who told Kynard that Albert Turner was in the county building and wanted to copy 500 applications for absentee ballots on a county copy machine. Kynard pointed out that on the application form itself there was a notice that it is against the law to copy the forms. Turner then left the office. Later, Kynard drove by Albert Turner's house one day. Outside the house were Albert Turner, Hogue, an Earl Ford, and a Wilbert Turner. Wilbert Turner was Kynard's opponent in the primary. They had a box in which were envelopes that looked a lot like "this" (apparently, the envelope provided absentee voters for mailing in the ballots). When Kynard drove by, they all panicked and got in a car. When Kynard went to the school to hand out some campaign material, his opponent Wilbert Turn-

er came in. When Kynard walked by Wilbert Turner's truck, he saw in the bed of the truck envelopes that looked like "these things" (apparently, the envelopes provided absentee voters for mailing in their ballots).

(b) In her closing argument for Hogue, one of his attorneys commenced by emphasizing the "overhanging" and "overriding" fact that there was nothing unusual about the number of absentee ballots cast in Perry County in the September 1984 primary. More absentee ballots had been cast in earlier elections. She contended that the case against Hogue had narrowed down to whether, without their consent, he had altered the absentee ballots of any of four voters: Mattie Perry, Zayda Gibbs, Will Fuller, and Angela Miree. The manner in which the FBI agents had approached and interrogated the various absentee voters had produced confusion and anxiety in the minds of the voters and had resulted in distortions in their testimony. The evidence—which counsel discussed in detail, particularly as to Will Fuller—did not support a finding that Hogue had made changes on any of these ballots, without the voter's consent.

As for conspiracy, there was none. Hogue, Albert Turner, and Evelyn Turner each worked alone in approaching people to apply for absentee ballots and, later, to vote for the League slate. Hogue did his assignments early, as early as two weeks before the primary. Albert Turner did his later, picking up the absentee ballots on the day before the primary. In his trial testimony, Kynard failed to mention Hogue as a conspirator until, on cross-examination, he said perhaps he had seen Hogue and perhaps he had not. The meeting on September 3, 1984, attended by Hogue and the Turners, listed in count 1 as an overt act, was an open meeting announced on the radio, to which the public had been invited; at the place, people were sitting around reading newspapers; some were on the porch; Hogue came into the meeting and left within 15 minutes to mail his ballots.[11]

11. The argument summarized in the text was made by one of Hogue's counsel, Ms. Guinier,

(c) In his rebuttal closing argument, the prosecutor contended: It was preposterous for the defense to argue (as some defense counsel apparently had argued) that Billingslea, Kynard, and an elections official had set a trap to catch defendants. The officeholders had told the FBI they suspected defendants were going to steal the election; the FBI examined the absentee ballots after they had been cast, selected 75 on which changes appeared, and proceeded to interview all 75 of those voters. The key election races were those of Billingslea and Kynard. They were the two persons against whom the Turners and Hogue were waging their vendetta. The Sheltons' testimony was more credible than Albert Turner's. The testimony of Pearl Brown and Willie Lee is to be believed. Evelyn Turner's statements are not to be believed. As to Hogue, the jury should examine Mattie Perry's ballot to see how he changed it. Hogue also changed the ballots of Angela Miree and Will Fuller. "I submit to you that Lillian Fuller's testimony is the testimony above all testimony that sinks Mr. Hogue." As a witness, Lillian Fuller was not scared or confused.

### E.  *The instructions to the jury*

The district judge provided the jurors with a list of the counts they were to consider and the name or names of the defendants charged in each count. He stated briefly that count 1 charges a conspiracy to commit mail fraud and to vote more than once, and said he would discuss that count last.

He proceeded to a discussion of counts 2, 3, 4, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 19, 20, 23, 24, and 26. He read from the indictment the description of the fraudulent scheme and explained that in each of this group of counts, a separate use of the mails was alleged, relating to the absentee ballot of a particular voter. As to each of this group of counts, he said, the government must have proved beyond a reasonable doubt that a particular defendant,

first, knowingly and willfully devised or intended to devise a scheme to defraud, substantially the same as the scheme alleged in the indictment, and, second, that the use of the mails was closely related to the scheme, because a defendant either mailed an altered absentee ballot or caused it to be mailed, knowing the ballot to have been altered, in an attempt to carry out or execute the scheme. He explained that altering a ballot meant marking it where the voter had not made a candidate selection or changing it to reflect a selection different from the voter's, all without the expressed or implied consent of the voter.

The district judge described three essential elements of the offense charged against Hogue in count 29: that a federal candidate was on the ballot; that defendant voted more than once for some candidate on the ballot; and that defendant did so knowingly and willfully for the specific purpose of having his vote count more than once. He explained that in count 29, voting meant marking the ballot of some other voter where the voter had not made a candidate selection or changing the ballot to reflect a selection different from the voter's, all without the expressed or implied consent of the voter.

The district judge concluded with a discussion of count 1. He read the count, including the description of the overt acts. He described the four essential elements of a conspiracy: that two or more persons come to a mutual understanding to try to accomplish the common and unlawful plan described in the indictment; that a defendant willfully became a member of the conspiracy; that one of the defendants, during the existence of the conspiracy, knowingly committed at least one of the overt acts alleged; and that the overt act was knowingly committed in an effort to carry out some object of the conspiracy.

### F.  *The verdict*

The jury's verdict in 85–00014 is not included in the record on this appeal. From

---

who explained that her co-counsel, Mr. Balske, would also address the jury. The first three lines of Mr. Balske's argument, but no more, appear in the record on the present appeal. No

closing argument by counsel for Albert Turner or Evelyn Turner appears in the record on this appeal.

the jury instructions, it can be discerned that a separate jury form was provided the jury for each defendant, listing the counts applicable to that defendant, and providing a place to insert a response of guilty or not guilty. Counsel have represented to this court on this appeal that the jury returned a verdict of not guilty on all counts as to all three defendants. This is not disputed and we take it as fact.

## II. *The present case (no. 85–00025)*

### A. *The indictment*

The indictment returned March 6, 1985, charges: That on or about the 2d day of February 1985, in the Southern District of Alabama, Northern Division, Spencer Hogue, Jr. corruptly endeavored to influence, obstruct and impede the due administration of justice, to-wit, Spencer Hogue, Jr. would and did endeavor to influence Will Fuller and Lillian Fuller, witnesses in a case of United States of America v. Albert Turner, Spencer Hogue, Jr. and Evelyn Turner, Criminal Number 85–00014, to provide untruthful testimony at the trial of the above said case, in violation of Title 18, United States Code, Section 1503.

### B. *Motion to consolidate*

On April 29, 1985, the government moved, under Fed.R.Cr.P. 13, for an order consolidating 85–00014 and 85–00025 for trial, on the ground that, under Fed.R.Cr.P. 8, the 85–00014 charges of conspiracy, mail fraud, and voting more than once and the 85–00025 charge of obstruction of justice could have been joined in a single indictment. The government contended that these four alleged offenses were part of the same series of acts or transactions and that judicial economy would be served by consolidation. Hogue opposed the motion. By brief, he contended that the crux of the allegations in 85–00014 was that Hogue and the Turners had conspired to and did defraud 26 people in regard to their voting rights in a series of actions ending September 4, 1984. He contended that "there is absolutely nothing in the asserted three-defendant, twenty-six victim, September 1984, election-influencing 'scheme' specifically al-

leged in the 85–00014 indictment which in any way encompasses or relates to the asserted one-defendant, two-victim, February 1985 witness-obstruction event alleged in the 85–00025 indictment. Rather, the alleged September 1984 'vote-fraud' conspiracy and the February 1985 'obstruction of justice' are completely and totally separate...." Hogue brief, dated May 15, 1985, pp. 3–4. Hogue contended, also, that consolidation would be prejudicial to him, as well as to the other defendants. Evidence that in September 1984 Hogue altered the ballot without consent might persuade the jury that in February 1985 he obstructed justice by his approach to the Fullers; evidence of the February approach to the Fullers might persuade the jury that in September he had acted without consent. Hogue brief, pp. 5–7. On June 3, 1985, the district court denied the government's motion for consolidation, without explanation.

### C. *The motion to dismiss*

Hogue moved in the district court to dismiss the indictment on the ground that it violates the double jeopardy prohibition of the fifth amendment. The essence of Hogue's contention was that in 85–00014, in reaching a verdict on count 24, the jury had disbelieved Lillian Fuller's testimony, had believed Hogue's grand jury testimony, and had decided that Lillian Fuller did consent to the change. In 85–00025, the indictment alleges that if Lillian Fuller were to testify at a trial in 85–00025 that she consented to the change on Will Fuller's ballot, she would be testifying falsely. So, Hogue contended, it would be necessary for the government to prove in 85–00025 that Lillian Fuller did not consent to the change. The government is estopped from relitigating this issue of fact.

Hogue's motion was filed in the district court at 9:00 a.m. on July 31, 1985, with supporting written argument, and with appendices embodying the testimony of Lillian Fuller and Will Fuller, and the jury instructions in 85–00014. On the same day, a written order was entered denying the motion on the ground that defendant had not borne his burden. No further explana-

tion was made. At 4:42 p.m. on the same day, notice of this appeal was filed.

## OPINION

■ Collateral estoppel is embodied in the fifth amendment guarantee against double jeopardy. When an issue of ultimate fact has once been determined by a valid and final judgment in a criminal case, it cannot again be litigated between the same parties. *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). In a criminal case a jury does not respond to a special interrogatory, but rather expresses itself in a verdict of guilty or not guilty. In such a case, when a verdict of not guilty is rendered, "the fact sought to be foreclosed must necessarily have been determined in [defendant's] favor in the prior trial; it is not enough that the fact *may* have been determined in the former trial." *United States v. Irvin*, 787 F.2d 1506, 1515 (11th Cir.1986) (emphasis in the original). The burden is on the defendant to prove by convincing and competent evidence that in the earlier trial, it was necessary to determine the fact sought to be foreclosed. *United States v. Hewitt*, 663 F.2d 1381, 1387 (11th Cir.1981).

## I.

■ In criminal cases, of course, the government bears the burden of proving beyond a reasonable doubt each of the factual propositions embodied in each of the essential elements of the offense charged. A guilty verdict is fairly to be characterized as a finding that each of those factual propositions is true. A not guilty verdict is fairly to be characterized only as a determination that the government has failed to prove beyond a reasonable doubt one or more of those propositions. A not guilty verdict is not fairly to be characterized as a finding that even one of those propositions is false, or that its opposite is true. Expressed accurately, the question in criminal cases involving possible collateral estoppel is whether the government should enjoy more than one opportunity to prove beyond a reasonable doubt the affirmative of a proposition. It is awkward continually to preserve this accuracy in discourse. This may explain why courts have spoken as though the falsity of a proposition—or the truth of its opposite—has been established by a not guilty verdict. For brevity, we will indulge in this manner of expression.

## II.

■ In the present case, Hogue's contention is simply stated: In order to arrive at a verdict of not guilty on count 24 in 85–00014, the jury found that, acting for Will Fuller, Lillian Fuller consented to cancel the marked vote for Billingslea on the Will Fuller ballot. The government is collaterally estopped in 85–00025 from attempting to prove that Lillian Fuller did not consent to cancel the marked vote. The indictment in 85–00025 charges Hogue with corruptly endeavoring to influence Will Fuller and Lillian Fuller "to provide untruthful testimony" at the trial in 85–00014. In context, the grand jury's reference to "untruthful testimony" can mean nothing other than testimony by Lillian Fuller that she consented to cancel the marked vote. If Lillian Fuller had so testified at trial in 85–00014, her testimony would have been truthful, not untruthful, as the trial jury in 85–00014 has determined. To secure a conviction in 85–00025, it will be necessary for the government to persuade a jury that such testimony by Lillian Fuller at trial in 85–00014 would have been untruthful. But the government is estopped from attempting so to persuade a jury in 85–00025.

If it is accurate that in returning a verdict of not guilty on count 24 in 85–00014, it was necessary for the jury to find that Lillian Fuller consented to cancel the marked vote, and if the government is estopped in 85–00025 from attempting to prove that she did not consent, an interesting question would arise. It is whether, under any circumstances, one can corruptly endeavor to influence, obstruct or impede the due administration of justice, in violation of 18 U.S.C. § 1503, by endeavoring to influence a prospective witness to provide truthful testimony at a trial. Neither counsel nor we have found judicial precedent on

the point, and government counsel has resolutely evaded a response to the question. Conceivably, such an endeavor could be considered corrupt if the defendant believed a true proposition to be false, or even, perhaps, if the defendant knew the prospective witness genuinely believed a true proposition to be false. It is unnecessary for us to resolve that question, however, because we conclude Hogue has failed to show by convincing and competent proof that in returning a verdict of not guilty on count 24 in 85–00014, it was necessary for the jury to find that Lillian Fuller had consented to cancel the marked vote.

### III.

An exercise of strict logic would render the doctrine of collateral estoppel inapplicable.

Count 1 of the indictment in 85–00014 charged a conspiracy in violation of 18 U.S.C. § 371. The jury was correctly charged that the essential elements of the offense are that: (1) two or more persons came to a mutual understanding to try to accomplish the common and unlawful plan described in the indictment; (2) Hogue willfully became a member; (3) during the existence of the conspiracy, one of the conspirators knowingly committed at least one of the overt acts alleged; and (4) the overt act was knowingly committed in an effort to carry out some object of the conspiracy. A not guilty verdict as to Hogue on count 1 could mean that the jury believed the government had not shown beyond a reasonable doubt that any two persons came to a mutual understanding to try to accomplish the plan described; or that, if such a mutual understanding had been reached by two persons, Hogue did not become a member; or that, if Hogue did become a member, he did not do so willfully; or that if he became a member willfully, none of the overt acts alleged, including the overt act described in paragraph 5(m) (a meeting of Hogue with Will Fuller on about September 1, 1984, for the purpose of procuring the absentee ballot of Will Fuller) was com-

mitted in an effort to carry out some object of the conspiracy. If the not guilty verdict was caused by any of these beliefs on the part of the jury, the verdict of acquittal on count 1 was sound. It would not have been necessary for the jury to determine that the government had failed to prove beyond a reasonable doubt that, acting for Will Fuller, Lillian Fuller withheld consent to cancel the marked vote for Billingslea.

It is the not guilty verdict as to him on count 24 upon which Hogue relies.

Count 24 charged that Hogue and the Turners devised a scheme, described in the count, to defraud the citizens of a fair and impartial Democratic primary, and that for the purpose of executing the scheme or attempting to execute it, the three placed and caused to be placed in the mails an envelope containing the altered absentee ballot of Will Fuller. A not guilty verdict as to Hogue on count 1 could mean that the jury believed the government had not shown beyond a reasonable doubt that Hogue devised such a scheme, singly or with either of the Turners; or that, if he did devise it, he placed or caused to be placed in the mail an envelope containing an absentee ballot of Will Fuller; or, if he did place or cause to be placed in the mail such an envelope, he did so for the purpose of executing the scheme. If the not guilty verdict was caused by any of these beliefs on the part of the jury, the verdict on count 24 was sound. It would not have been necessary for the jury to determine that the government had failed to prove beyond a reasonable doubt that, acting for Will Fuller, Lillian Fuller withheld consent to cancel the marked vote for Billingslea.[12]

### IV.

However, "the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." The inquiry must be set in a practical frame. A court must examine the entire record of the prior proceeding. It must take into account the

**12.** We will discuss count 29, the double-voting count, later.

indictment, evidence, jury instructions and other relevant matter in the prior proceeding. It must then decide whether a rational jury could have reached its not guilty verdict without having decided an ultimate issue of fact which the government seeks to litigate in the later prosecution. *Ashe v. Swenson,* 397 U.S. at 444, 90 S.Ct. at 1194. We will refer to this test as the necessity test.

A realistic example, simplified for the purpose of analysis, is a case in which there is a single defendant and there are two essential elements of the offense charged, but in which the government evidence of the first element is unassailable, or virtually so, and the defense makes no effort, or virtually none, to challenge it. In such a case, a jury could not rationally determine the ultimate issue of fact embodied in the first element adversely to the government. To reach a verdict of not guilty, it would be a necessity for a rational jury to determine the ultimate issue of fact embodied in the second element adversely to the government. If a jury does return a verdict of not guilty in such a case, the government is collaterally estopped in any subsequent criminal prosecution of the same defendant from litigating the ultimate issue of fact embodied in the second element of the offense tried in the earlier trial. The factual situation in *Ashe v. Swenson,* itself presented such a case.

The case before us is clearly not such a case. The first count in the indictment in 85–C–00014 was a conspiracy count, and the second group of counts (2 through 27), mail fraud counts. Proof of the formulation of a fraudulent scheme was as central to the mail fraud counts as proof of the formulation of a plan was to the conspiracy charge. The indictment's description of the plan in the conspiracy count was virtually identical to its description of the fraudulent scheme in the mail fraud counts. Indeed, count 1 alleged that in violation of 18 U.S.C. § 371, Hogue and the Turners had conspired to use the mails, in violation of 18 U.S.C. § 1341, in furtherance of the very fraudulent scheme which is described in the mail fraud counts.

Because the portion of the record of the trial in 85–00014 is so limited, we cannot evaluate the strength of the government's evidence of Hogue's participation in the formulation of the alleged conspiracy and the alleged fraudulent scheme. It is not a rarity in criminal cases for defense counsel expressly to concede the strength of the government's evidence as to all but one of the essential elements, and then to zero in on the weakness of the proof on the remaining element. There is no evidence that this tactic was employed by Hogue or by the Turners at the trial in 85–00014. Although none of the three defendants testified or presented evidence, in the closing argument by one of Hogue's counsel the formulation of a conspiracy among Hogue and the Turners—and by necessary implication, the formulation of a fraudulent scheme by them—was stoutly disputed. Hogue's counsel argued that, based on the government's evidence:

(a) There was nothing unusual about the number of absentee ballots cast in Perry County in the September 1984 primary. The suggested inference is that the whole absentee voter project in 1984 was not concocted for the first time in 1984 to target Billingslea and Kynard for destruction.

(b) Hogue, Albert Turner, and Evelyn Turner each worked alone on their respective lists of prospective absentee voters. Hogue completed his work early; Albert Turner, late.

(c) A purportedly conspiratorial gathering on September 3, 1984, had in fact been announced on the radio and was public. At the meeting, people sat around reading newspapers and some were on the porch.

(d) Hogue's attendance at the September 3 meeting was brief.

(e) Kynard, who apparently was an important government witness on the existence of a conspiracy and a fraudulent scheme, omitted mention of Hogue as a conspirator until cross-examination, and the mention then was ambiguous.

Clearly, in prosecuting his collateral estoppel contention in 85–00025, Hogue has failed to meet his burden to show by convincing and competent evidence that in 85–00014 a rational jury could not have determined in Hogue's favor the question whether the described conspiratorial plan was formulated by Hogue and the Turners (count 1) and whether the described fraudulent scheme was formulated by them (counts 2 through 27). It follows Hogue has failed to show that in order to find Hogue not guilty on count 29 it was necessary for a rational jury to decide in defendant's favor on a separate element of the offense: the absence of consent to the cancellation of the marked vote for Billingslea on the Will Turner ballot.

### V.

Hogue's argument here subtly evades the test of necessity. It is directed not to the necessity for a rational jury to reach its not guilty verdict by a certain route, but rather to the probability that a specific jury actually reached its not guilty verdict by a certain route.

Hogue contends that in 85–00014, count 24 was actually tried on the simple issue whether Lillian Fuller or Hogue was to be believed on the matter of consent or nonconsent. Hogue emphasizes that at trial, the government presented the testimony of Lillian Fuller, not only that she did not consent, but that later, when Hogue approached her, she told him she would not testify that she had consented; and that the government presented Hogue's grand jury testimony that Lillian Fuller had consented. Hogue emphasizes, too, that in the government's initial closing argument, the prosecutor recounted Lillian Fuller's testimony at length; that Lillian Fuller's testimony and Hogue's grand jury testimony about the Will Fuller ballot were also discussed and analyzed at some length by one of Hogue's counsel in closing argument; and that in the government's second closing argument, the prosecutor stressed Lillian Fuller's testimony and described it as "the testimony above all testimony that sinks Mr. Hogue." In rebuttal in oral argument in this court on this appeal, Ho-

gue's counsel called special attention to a statement government counsel had made in his argument here. In response to questioning, government counsel stated that at trial the government had argued Hogue and the Turners did not have consent from the various voters to alter their ballots, and that this was the theory of the case all the way through.

Drawing upon these aspects of the record in 85–00014, Hogue contends that as to count 24, the eyes and ears of the jurors were directed to the conflict in the testimony of Lillian Fuller and Hogue on the issue of consent, this must have caused the jury's deliberations to turn totally to that issue, and the jury proceeded to reject Lillian Fuller's version and embrace Hogue's.

This line of argument is to be compared with arguments in support of motions for a new trial: that some error in the course of a trial was prejudicial; e.g., a guilty verdict was probably caused by the jury's view of grisly physical evidence improperly admitted or by a trial judge's demeanor or by a certain joinder of parties or counts or by some prosecutorial misconduct. It represents an effort to ascertain the thought process in which the jury actually engaged. It does not represent an analysis of what it was necessary for a jury to determine if it were to reach a verdict of not guilty in a given set of circumstances.

Even if we were to apply Hogue's proposed test rather than the necessity test— and we decline to do so—, for several reasons we would reach the conclusion that collateral estoppel is not operative here. (1) Hogue did challenge at trial the strength of the government's evidence on a separate element of the count 24 offense that Hogue had formulated a fraudulent scheme with the Turners. (2) The jury was clearly instructed that it must find beyond a reasonable doubt that Hogue did participate in the formulation of such a scheme. (3) As we have noted, there was testimony concerning 11 separate episodes involving changes in absentee ballots. In some of these episodes, Hogue was the actor; in others, Albert Turner; in still others, Evelyn Turner. The transcript of the grand

jury testimony of Hogue presented by the government at trial contained his account of what occurred in the episodes in which he was the actor. We do not know the content of the Turners' grand jury testimony, but it seems reasonable to infer it contained their accounts of what occurred in the episodes in which each of them was the actor. Countering the defendants' grand jury testimony was the testimony of 11 separate live witnesses or sets of witnesses, giving their accounts of the 11 separate episodes. Except for the Will Fuller episode, we are left uninformed about the content of the testimony of these countervailing witnesses, but we may reasonably infer that it differed critically from that of Hogue and the Turners on the issue of consent. Of course, it is conceivable that as to each separate episode, the jury believed defendants' testimony and disbelieved the contrary testimony of each of the government witnesses. But it seems at least as likely that the jury based its complete acquittal of all three defendants on counts 1 through 27 on some single issue, common to all those counts. The single issue that suggests itself is whether the government had proved beyond a reasonable doubt that a single conspiracy or a single fraudulent scheme underlay the 11 episodes, even though unauthorized alterations may have been performed here or there by one or another of the defendants. At the very least it must be concluded that Hogue has failed to prove by convincing and competent evidence that this was not the jurors' actual thought process.

## VI.

■ Hogue's argument is directed entirely to the not guilty verdict on count 24, but the effect of the not guilty verdict on count 29 requires brief comment. Count 29 charges a straightforward substantive offense of double voting. Neither conspiratorial plan nor a fraudulent scheme is an element of the offense.

As we have noted, the jury was instructed that for the purpose of count 29: first, for a defendant to mark a candidate selection on the ballot of some other voter in a race where that voter has not marked a candidate selection, without the expressed or implied consent of that voter, constitutes voting; and, second, for a defendant to change or alter the mark on the ballot of some other voter to vote for some candidate different from the candidate selected by that voter, without the expressed or implied consent of that voter, constitutes voting. The jury was instructed that in order to find Hogue guilty on count 29, it was required to agree unanimously that he had voted more than once in one of these two manners of voting, or to agree unanimously that he had voted more than once in the other of these two manners of voting. As we have noted, also, both in opening statement and initial closing argument, the government contended that Hogue had voted more than once on another person's ballot, in one or the other of these two ways.

If a rational jury believed that Hogue had voted in this manner by cancelling the mark for Billingslea on Will Fuller's ballot, without consent, but that he had not voted in this manner as to the ballot of any other person, it was necessary to find Hogue not guilty on count 29.

As the case went to the jury in 85–00014, Hogue was accused of voting in this manner in the ballots of Mattie Perry, Angela R. Miree, Will Fuller, and Zayda E. Gibbs. A rational jury was free to find that Hogue had not voted in this manner on the ballots of Mattie Perry, Angela R. Miree, and Zayda E. Gibbs. If a rational jury had made this determination as to the ballots of these three voters, it was necessary for the jury to find Hogue not guilty on count 29, because he could then have voted in this manner only once. In order to return a verdict of not guilty on count 29, it was not necessary for a rational jury to determine that Hogue had not voted in this manner on the ballot of Will Fuller.

Had there been presented at trial in 85–00014 uncontradicted and unassailable evidence that Hogue had cast his own ballot, lawfully, in the September 4, 1984, Democratic primary, then, in order to find Hogue not guilty in count 29, it would have been

necessary for a rational jury to find that Hogue had not also voted indirectly on the ballots of Will Fuller, Mattie Perry, Angela R. Miree, and Zayda E. Gibbs. The government would be estopped from attempting to prove in 85–00025 that Hogue had indeed voted in this manner on the ballot of Will Fuller; that is, that without Lillian Fuller's consent, he had cancelled the marked vote for Billingslea on Will Fuller's ballot.

However, there is nothing in the partial record from 85–00014 available to the district court or to us in 85–00025 to indicate that the government presented evidence Hogue had cast his own ballot lawfully in the September 4, 1984 primary. On the contrary, the prosecutor's opening statement and initial closing argument and the court's instructions to the jury strongly indicate that the government's proof on count 29 was that Hogue's double voting occurred exclusively through his unauthorized marking of the ballots of two or more members of the group consisting of Mattie Perry, Angela R. Miree, Will Fuller, and Zayda E. Gibbs.

## ORDER

The order of the district court denying defendant-appellant Hogue's motion to dismiss the indictment, on the ground of double jeopardy and collateral estoppel, is AFFIRMED and the case is REMANDED to the district court for further proceedings.